(No. 67709.—

WILDER BINDING COMPANY, Appellee, v. OAK PARK TRUST AND SAVINGS BANK, Appellant.

*Opinion filed February 16, 1990.—Rehearing denied April 9, 1990.*

122

STAMOS, J., took no part.
CALVO, J., joined by CLARK, J., dissenting.

William B. Davenport, Lynn A. Goldstein and Mary S. Binder, of the Law Department of The First National Bank of Chicago; Michael B. Susman, Robert J. Krull and Jonathan L. Loew, of Spitzer, Addis, Susman & Krull, all of Chicago, for appellant.

Loren J. Mallon and Marc R. Jacobs, of Gottlieb & Schwartz, of Chicago, for appellee.

John J. Gill, Michael F. Crotty and Thomas J. Greco, of Washington, D.C., for *amicus curiae* American Bankers Association.

Michael J. Sweeney and Timothy R. Kane, of Sidley & Austin, of Chicago, for *amicus curiae* Chicago Clearing House Association.

Harvey B. Stephens, Emmet A. Fairfield and Denise M. Druhot, of Brown, Hay & Stephens, of Springfield, for *amicus curiae* Illinois Bankers Association.

Johnson & Colmar, of Chicago (Mark V. Chester and Elizabeth J. Cohen, of counsel), for *amicus curiae* Illinois Public Action Council.

CHIEF JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Wilder Binding Company, filed this breach of contract action in the circuit court of Cook County against defendant, Oak Park Trust and Savings Bank. Plaintiff sought to recover $19,630 in damages from defendant, because of its alleged improper payment of a series of forged checks. Plaintiff filed a motion for summary judgment pursuant to section 2—1005 of the Code

of Civil Procedure (Code) (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005). The circuit court granted the motion and entered judgment in favor of plaintiff in the amount of $19,630. Defendant appealed.

On appeal, a majority of the appellate court affirmed, holding that there was no genuine issue as to any material fact and that plaintiff was entitled to summary judgment as a matter of law. The court reasoned that a bank fails to exercise ordinary care under section 4—406(3) of the Uniform Commercial Code (Ill. Rev. Stat. 1985, ch. 26, par. 4—406(3)) (section) when it uses automated check-sorting equipment and automatically pays checks drawn for less than a designated amount without manually verifying the signatures on those checks. The dissent stated that summary judgment should not have been entered, because the question regarding whether a bank exercised ordinary care in paying checks under the section is one of fact which should be answered by the trier of fact. 173 Ill. App. 3d 34.

This court granted defendant's petition for leave to appeal (107 Ill. 2d R. 315) and accepted *amicus curiae* briefs from the Illinois Public Action Council in support of plaintiff, and from the American Bankers Association, the Illinois Bankers Association and the Chicago Clearing House Association in support of defendant. 107 Ill. 2d R. 345.

The only issue presented for review is whether the appellate court erred in affirming the circuit court's entry of summary judgment in favor of plaintiff.

On April 23, 1981, plaintiff opened a business checking account with defendant. On that same date, plaintiff filed a signature card with defendant which designated Donald W. McCarrell, plaintiff's president, and Douglas S. McCarrell, plaintiff's vice-president, as the authorized signatories on its business checking account No. 864—398.

In December 1983, Lorine Daniels was hired as plaintiff's bookkeeper. Between December 20, 1983, and June 29, 1984, Daniels embezzled $25,254.78 from plaintiff by forging Douglas S. McCarrell's signature on 42 checks which were made payable to herself. Each of the forged checks was drawn for less than $1,000.

Once defendant paid the forged checks, they were cancelled and returned to plaintiff in the monthly statements of account. Plaintiff received statements containing forged checks for the following months: December 1983 and January, February, March, April, May, June and July 1984. However, under plaintiff's bookkeeping system, Daniels reviewed the monthly statements and cancelled checks.

The checks forged by Daniels were not discovered until July 15, 1984, when plaintiff's comptroller found them while examining company records. On July 20, 1984, plaintiff notified defendant of the forged checks and demanded reimbursement of $25,254.78, the sum total of the 42 forged checks.

As an accommodation to plaintiff, a long-standing customer, defendant reimbursed $5,624.78, which represented the sum total of forged checks contained in the monthly statements for June and July 1984. Defendant refused to reimburse the remaining $19,630 on the basis that affirmative defenses contained in the Commercial Code prevented plaintiff from recovering those funds.

On December 24, 1984, plaintiff filed its verified complaint seeking to recover $19,630 in damages from defendant. On March 20, 1985, defendant filed its answer and affirmative defenses to plaintiff's verified complaint. Defendant asserted as its affirmative defenses sections 3—404, 3—406 and 4—406 of the Commercial Code (Ill. Rev. Stat. 1985, ch. 26, pars. 3—404, 3—406, 4—406). On July 9, 1985, plaintiff filed its answer to

defendant's affirmative defenses alleging the insufficiency of those defenses.

Over one year later, on July 16, 1986, plaintiff filed a "Request to Admit Facts." The request provided in relevant part that: (1) between December 1, 1983, and July 1, 1984, defendant utilized automated check-sorting equipment which separated checks drawn for less than $1,000 from checks drawn for $1,000 or more; (2) the signatures on checks which were drawn for less than $1,000 were not manually verified before being paid; and (3) as a consequence of defendant's use of automated check-sorting equipment, none of the signatures on the forged checks were manually verified. As defendant neither denied nor objected to plaintiff's "Request to Admit Facts," the aforementioned facts were considered admissions by defendant pursuant to Supreme Court Rule 216(c) (107 Ill. 2d R. 216(c)).

Approximately two weeks later, on August 1, 1986, plaintiff filed its motion for summary judgment (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005). The motion was supported by a memorandum of law and the affidavit of Douglas S. McCarrell. The affidavit provided in part that: (1) Douglas S. McCarrell was plaintiff's vice-president; (2) only he and Donald W. McCarrell were authorized signatories on plaintiff's checking account No. 864—398; (3) 42 checks purportedly bearing his signature were drawn on plaintiff's account, but neither did he sign the checks nor did he or anyone else authorize the signing of those checks; (4) plaintiff's comptroller discovered the forged checks and notified him of them on July 15, 1984; and (5) plaintiff notified defendant of the forged checks and demanded reimbursement of the total amount paid, but defendant only reimbursed $5,624.78 and has refused to reimburse the remaining $19,630.

On November 10, 1986, defendant responded to plaintiff's motion for summary judgment by filing a memo-

randum of law and the counteraffidavit of Robert S. Visconti, defendant's assistant vice-president. The counteraffidavit provided in part that: (1) Robert S. Visconti was defendant's assistant vice-president in charge of bookkeeping and check disbursement; (2) defendant processed an average of between 8,000 and 11,000 checks per day and that an average of 650 to 750 of those checks were written for more than $1,000; (3) defendant maintained a staff of five full-time employees and additional part-time employees to manually verify the signatures on all checks written for $1,000 or more; (4) defendant and at least four other banks in the metropolitan Chicago area utilized automated check-sorting equipment to separate checks drawn for less than the designated amount from checks drawn for the designated amount or more; and (5) the signatures on checks drawn for less than the designated amount were not manually verified before being paid, while signatures on checks drawn for more than the designated amount were manually verified before being paid.

Plaintiff contends that the appellate court did not err in affirming the circuit court's entry of summary judgment. Its contention is based on its belief that no genuine issue as to any material fact exists and, accordingly, that it is entitled to summary judgment. It argues that defendant's admitted use of automated check-sorting equipment and automatic payment of checks drawn for less than $1,000 without manual verification of the signatures on those checks conclusively establishes, as a matter of law, defendant's failure to exercise ordinary care under the section.

Section 4—406 of the Commercial Code provides banks with an affirmative defense to the general rule that they are liable for paying forged checks. (See Ill. Rev. Stat. 1985, ch. 26, par. 3—401.) Under sections 4—406(1) and (2) of the Commercial Code, if a bank pays a

forged check and later establishes that its customer was negligent in examining bank statements, detecting forgeries and notifying the bank of the forgeries, the customer is precluded from asserting the bank's liability. (Ill. Rev. Stat. 1985, ch. 26, pars. 4—406(1), (2).) However, under the section, if the customer establishes that his bank failed to exercise ordinary care in paying a forged check, the bank's section 4—406(1) and (2) affirmative defense is inapplicable and, as such, the bank is liable to its customer for the total amount of the forged checks. Therefore, according to plaintiff, even assuming *arguendo* that it was negligent, defendant is nevertheless liable for the total amount of the forged checks, because defendant's admissions conclusively establish, as a matter of law, its failure to exercise ordinary care under the section.

Notwithstanding its admissions, defendant argues that its use of automated check-sorting equipment and automatic payment of checks drawn for less than $1,000 without manual verification of the signatures on those checks constitutes the *prima facie* exercise of ordinary care. Defendant's argument is based on section 4—103(3) of the Commercial Code, which provides in pertinent part:

> "[I]n the absence of special instructions, *action or non-action consistent* *** *with a general banking usage* not disapproved by this Article, *prima facie constitutes the exercise of ordinary care.*" (Emphasis added.) Ill. Rev. Stat. 1985, ch. 26, par. 4—103(3).

The term *general banking usage* "is not defined but *should be taken to mean a general usage common to banks in the area concerned.*" (Emphasis added.) (Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 441 (Smith-Hurd 1963).) Additionally,

> "[w]here the adjective 'general' is used, the intention is to require a usage broader than a mere practice between

two or three banks but it is not intended to require any-thing as broad as a country-wide usage. *A usage followed generally throughout* a state, a substantial portion of a state, a *metropolitan area or the like would certainly be sufficient.*" (Emphasis added.) (Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 441 (Smith-Hurd 1963).)

Therefore, defendant concludes that its use of automated check-sorting equipment and automatic payment of checks drawn for less than $1,000 without manual verification of the signatures on those checks constitutes the *prima facie* exercise of ordinary care. Defendant's conclusion is based on Visconti's counteraffidavit, which indicates that more than two or three banks in the metropolitan Chicago area also use automated check-sorting equipment and automatically pay checks drawn for less than a designated amount without manually verifying the signatures on those checks.

In affirming the circuit court's entry of summary judgment, the appellate majority relied primarily on the case of *Medford Irrigation District v. Western Bank* (1984), 66 Or. App. 589, 676 P.2d 329. In *Medford*, a majority of the Oregon Court of Appeals held that, as a matter of law, Western Bank failed to exercise ordinary care pursuant to the Oregon Commercial Code when it used automated check-sorting equipment and automatically paid checks drawn for less than $5,000 without manually verifying the signatures on those checks. (*Medford*, 66 Or. App. at 593, 676 P.2d at 332.) The dissent expressed the opinion that the question regarding whether a bank exercised ordinary care in the payment of checks is one of fact which should be answered by the trier of fact. *Medford*, 66 Or. App. at 598, 676 P.2d at 335 (Van Hoomissen, J., dissenting).

Like the *Medford* dissent and the dissent in this case, several other courts have held that the question of

whether a bank exercised ordinary care in paying a check presents a genuine issue of material fact which should be answered by the trier of fact and, therefore, summary judgment should not be entered. (See *Five Towns College v. Citibank, N.A.* (1985), 108 A.D.2d 420, 489 N.Y.S.2d 338; *Space Distributors, Inc. v. Flagship Bank* (Fla. App. 1981), 402 So. 2d 586; *K & K Manufacturing, Inc. v. Union Bank* (App. 1981), 129 Ariz. 7, 628 P.2d 44; *Exchange Bank & Trust Co. v. Kidwell Construction Co.* (Tex. App. 1971), 463 S.W.2d 465; see also 7 R. Anderson, Uniform Commercial Code §4—406:12 (3d ed. 1985).) We agree with the rationale of these cases. Accordingly, in order to determine whether the appellate court erred in affirming the circuit court's entry of summary judgment in this case, the general principles governing summary judgment must be discussed.

The purpose of a summary judgment proceeding is to determine whether there are any genuine issues of material fact. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) Summary judgment should be granted only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c).

Summary judgment is both "an aid in the expeditious disposition of a lawsuit" and "a drastic means of disposing of litigation." (*Purtill*, 111 Ill. 2d at 240.) When considering the pleadings, depositions, admissions, exhibits and affidavits on file, a court "must construe them strictly against the movant and liberally in favor of the opponent" and enter a summary judgment "only when the right of the moving party is clear and free from doubt." *Purtill*, 111 Ill. 2d at 240.

In applying these general principles to this case, we must consider the pleadings, admissions, exhibits and af-

fidavits on file and construe them strictly against plaintiff and liberally in favor of defendant. After carefully reviewing the record, including both defendant's admissions and Visconti's counteraffidavit, we believe that a genuine issue of material fact exists regarding whether defendant exercised ordinary care in paying checks under the section. Therefore, it should be left up to the trier of fact to determine whether defendant's use of automated check-sorting equipment and automatic payment of checks drawn for less than $1,000 without manual verification of signatures on those checks is "consistent with general banking usage" and, accordingly, *"prima facie* constitutes the exercise of ordinary care." As such, we hold that the appellate court erred in affirming the circuit court's entry of summary judgment in favor of plaintiff.

For the reasons stated above, the decisions of both the appellate court and the circuit court are reversed and this cause is remanded to the circuit court for proceedings consistent with this opinion.

*Appellate court reversed;*
*circuit court reversed;*
*cause remanded.*

JUSTICE STAMOS took no part in the consideration or decision of this case.

JUSTICE CALVO, dissenting:

Because I conclude defendant's failure to review checks drawn for under $1,000 constituted a lack of ordinary care as a matter of law, I respectfully dissent. In my view, the appellate court properly affirmed the trial court's order granting plaintiff's motion for summary judgment. Accordingly, I would affirm the appellate court.

Applying the summary judgment principles of *Purtill v. Hess* (1986), 111 Ill. 2d 229, the requirements of the Uniform Commercial Code (Code) (Ill. Rev. Stat. 1983, ch. 26, par. 1—101 *et seq.*), and the rationale and decision of the Oregon court in *Medford Irrigation District v. Western Bank* (1984), 66 Or. App. 589, 676 P.2d 329, I conclude no issue of material fact existed as to whether defendant exercised ordinary care. Defendant did not manually verify signatures on checks written for under $1,000, and had no system for verifying signatures on checks under that amount. Defendant's automatic payment of all checks drawn for less than $1,000, without manual verification of the signatures on those checks, conclusively established defendant's failure to exercise ordinary care under the Code. Complete absence of review accompanied by an absence of a *system* for review, in my view, constitutes, as a matter of law, lack of ordinary care.

As the majority indicates, banks are generally liable for paying forged checks. (See Ill. Rev. Stat. 1983, ch. 26, par. 3—401(1) ("No person is liable on an instrument unless his signature appears thereon"); Ill. Rev. Stat. 1983, ch. 26, par. 3—404(1) ("Any unauthorized signature is wholly inoperative as that of the person whose name is signed"); Ill. Rev. Stat. 1983, ch. 26, par. 1—201(43) (an unauthorized signature includes a forgery); Ill. Rev. Stat. 1983, ch. 26, par. 4—401(1) (a bank may charge against a customer's account only those items which are "properly payable").) Nevertheless, if a bank pays a forged check and later establishes its customer's negligence in examining the bank statements, and failing to detect and notify the bank of forgeries, the customer cannot assert the bank's liability. (Ill. Rev. Stat. 1983, ch. 26, pars. 4—406(1), (2).) The bank's defense is inapplicable, however, if the customer establishes the bank's

failure to exercise "ordinary care" in paying the forged check. Ill. Rev. Stat. 1983, ch. 26, par. 4—406(3).

The Code does not define "ordinary care." (Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 440 (Smith-Hurd 1963).) Instead, for purposes of the Code, ordinary care is "used with its normal tort meaning and not in any special sense relating to bank collections." (Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 440 (Smith-Hurd 1963).) Under section 4—103(3) of the Code, however, action or inaction by a bank which is consistent with general banking usage "prima facie constitutes the exercise of ordinary care." (Ill. Rev. Stat. 1983, ch. 26, par. 4—103(3).) Nevertheless, customers can:

> "prescribe other standards and where there may be no direct supervision or control of clearing houses or banking usages by official supervisory authorities, the confirmation of ordinary care by compliance with these standards is prima facie only, thus conferring on the courts the ultimate power to determine ordinary care in any case where it should appear desirable to do so. The prima facie rule does, however, impose on the party contesting the standards to establish that they are unreasonable, arbitrary or unfair." (Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 441 (Smith-Hurd 1963).)

Consequently, while proof of compliance with general banking usage can provide the bank with *prima facie* evidence of ordinary care, a customer can rebut this evidence with proof that the bank's standards are unreasonable, arbitrary or unfair.

Defendant asserts it provided *prima facie* evidence of ordinary care through Visconti's affidavit. Defendant also contends plaintiff provided no proof whatsoever that defendant's procedures or standards were unreasonable, arbitrary or unfair. The majority holds that the trier of fact should determine whether defendant's automatic

payment of checks drawn for less than $1,000 is consistent with general banking usage, and thus constitutes *prima facie* evidence of ordinary care.

I agree with plaintiff's contention that defendant's complete lack of procedures to detect forgeries is unreasonable in and of itself and therefore proves the absence of ordinary care, even if defendant established its *prima facie* case. Plaintiff's proof consisted of defendant's admitted lack of procedures; this proof revealed a lack of ordinary care.

Even if defendant "established conformity with local standards," defendant "is not automatically exonerated." (*Hanover Insurance Cos. v. Brotherhood State Bank* (D. Kan. 1979), 482 F. Supp. 501, 506.) The industry standard may be considered as evidence of compliance with ordinary care, but such evidence is not conclusive. " 'Even an entire industry, by adopting such careless methods to save time, effort or money, cannot be permitted to set its own uncontrolled standard.' " (*Hanover*, 482 F. Supp. at 506, quoting W. Prosser, Law of Torts 167 (4th ed. 1971).) In *Perley v. Glastonbury Bank & Trust Co.* (1976), 170 Conn. 691, 702-03, 368 A.2d 149, 155, the court held:

> "An officer of one of the defendant banks testified that it was customary bank procedure to accept *** a check as presented without authenticating the endorsements and to rely on its ability to charge the account of the payee if the endorsements proved invalid. Such procedure may well be common among banks, but the defendants failed to show that such conduct is reasonable. An examination of signature cards to determine the genuineness of endorsements may not be entirely practical under modern banking methods, but we do not feel that that necessarily relieves banks of the risk of loss from payment on forged checks. [Citation.] The law places the risk of loss from forged endorsements on the drawee bank unless it can affirmatively prove the drawer's negligence and its own

due care. Such a legal presumption accords with the practical realities of commercial banking transactions since the banks are in a better position than private parties *** to secure means of insurance against losses by forgeries.''

(See also *American Machine Tool Distributors Association v. National Permanent Federal Savings & Loan Association* (D.C. 1983), 464 A.2d 907, 915; *First National Bank v. Hovey* (1980), 10 Mass. App. Ct. 715, 723, 412 N.E.2d 889, 894-95.) "Mere technological innovations, an increased workload and a desire to save time, money and effort do not relieve the bank of its responsibility to exercise ordinary care." (*Hanover*, 482 F. Supp. at 509.) We should not permit an industry to set standards which thereby insulate it from liability.

Defendant claims it does not lack procedures to discover forgeries; rather, it has one such procedure. That procedure involves sending bank statements and cancelled checks to customers monthly. In this way, customers, who are in the best position to do so, can detect forgeries once they review the statements. Defendant's argument has absolutely no merit. Customers already have a duty to examine their bank statements under sections 4—406(1) and 4—406(2). Defendant cannot abdicate its duty of ordinary care under section 4—406(3) to plaintiff. Defendant is, in effect, relying on its customers' duty of review to fulfill its own duty of ordinary care. I cannot sanction such a result. The result I reach in no way lessens a customer's responsibility to promptly examine bank statements. I simply conclude that a bank cannot use its customers' duty to discharge its own duty of care.

While in some circumstances, the decision as to what amounts to ordinary care may be an issue of fact, the situation before this court does not present such an instance. The affidavits and admissions before the circuit

court indicated defendant's system of clearing checks precluded *any* review of the checks and forgeries here in question. Defendant's affidavit revealed that out of 8,000 to 11,000 checks processed per day, an average of 650 to 750 of the checks are written for more than $1,000. Defendant's automatic check-sorting equipment separates these 650 to 750 checks from the other checks for manual review. Thus, defendant verifies the signatures on about 7% of the checks processed. Defendant does not verify the signatures on approximately 93% of all checks. Automatic preclusion from review of 93% of all checks processed based solely on the amount of the check does not present a genuine issue as to any material fact.

Ordinary care is to be used with its "normal tort meaning." (Ill. Ann. Stat., ch. 26, par. 4—103, Uniform Commercial Code Comment, at 440 (Smith-Hurd 1963).) Defendant points out that issues of negligence are usually questions of fact. (See *Berg v. New York Central R.R. Co.* (1945), 391 Ill. 52, 63.) Even under tort law, however, negligence may be a question of law if the acts constituting negligence " 'are of such a character that all reasonable men would concur in pronouncing them so.' " (*Berg*, 391 Ill. at 63, quoting *Chicago, Burlington & Quincy R.R. Co. v. Pollock* (1902), 195 Ill. 156, 163.) I conclude all reasonable persons would agree that defendant's lack of procedures constituted negligence. As a matter of law, an absence of any review amounts to a lack of ordinary care.

My decision does not mean defendant would have to manually review the signatures on all of the checks which cross defendant's threshold prior to payment. Nevertheless, every check crossing defendant's threshold should be subject to some *probability* of examination. For example, the court in *Rhode Island Hospital Trust National Bank v. Zapata Corp.* (1st Cir. 1988), 848 F.2d

291, 294, found the bank exercised ordinary care when the bank (1) examined signatures on every check for more than $1,000; (2) examined signatures on checks between $100 and $1,000, if the bank had reason to suspect a problem (*e.g.*, if a check was drawn on an account with insufficient funds); and (3) examined signatures on a randomly chosen 1% of all other checks between $100 and $1,000. In *Rhode Island*, though the bank did not review every check, the bank's system subjected virtually every check to the potential for sight review prior to payment. I cannot say the procedure in *Rhode Island* would conclusively constitute ordinary care. The facts of *Rhode Island* played a significant role in that decision and I cannot at this time determine whether the $100 threshold or the 1% level would be appropriate. Nevertheless, *Rhode Island* provides an example of a system of review. In addition, the *Rhode Island* court intimated the practices in *Medford* were "more obviously unreasonable" than the practices of the bank before it. *Rhode Island*, 848 F.2d at 295-96.

The Oregon Court of Appeals in *Medford*, in determining the issue before it as one of law and not of fact, noted:

"The reasonableness of commercial banking standards must be analyzed in the context of a bank's duty in relation to the depositor's account. Although a procedure may be common throughout the banking industry, it is not, by that fact alone, a reasonable procedure. Implied in the relationship between a bank and its checking account depositors is a contractual undertaking on the part of the bank that it will only discharge its obligation to a depositor on an authorized signature. \*\*\*

\*\*\* *We do not hold that a bank must adopt a particular procedure, such as 'sight review,' in order to comply with the statutory mandate. We do hold that the procedure used must reasonably relate to the detection of unauthorized signatures in order to be considered an exercise of or-*

*dinary care or reasonable commercial banking standards.* [The bank's] approach is automatically to pay all checks under $5,000 without any procedure to detect unauthorized signatures on those items. While that approach, based on considerations of cost and efficiency, may be a prudent business decision and followed by most banks, it does not meet the bank's responsibility under the statutes.

\* \* \*

We conclude that, because [the bank] failed to exercise ordinary care or to follow reasonable commercial banking practices, it is foreclosed from asserting plaintiff's negligence and is liable for paying the face amount of the forged checks. There is no issue of fact as to [the bank's] liability or the amount." (Emphasis added.) (*Medford,* 66 Or. App. at 592-97, 676 P.2d at 332-34.)

As in *Medford,* defendant in the case at bar admitted it has no procedure for reviewing the signatures on checks drawn for under a certain dollar amount. Such automatic nonreview violates the statutory duty of care owed the bank customer. I agree with the *Medford* court that "the procedure used must reasonably relate to the detection of unauthorized signatures in order to be considered an exercise of ordinary care." *Medford,* 66 Or. App. at 593, 676 P.2d at 332.

Defendant asserts *Medford* is distinguishable because the threshold amount was $5,000 and thus greater than the $1,000 threshold amount in the case at bar. I do not find this distinction significant, especially because defendant only reviewed approximately 7% of the checks it processed using the lower threshold. Even with the lower threshold, defendant still did not exercise ordinary care.

I find the cases the majority cites for support distinguishable on their facts. As I stated earlier, some instances may occur where the issue of ordinary care is a question of fact; such is not the case here. *Medford* is

more factually similar to the case at bar than the cases cited by defendant and the majority, and I find the court's reasoning in *Medford* persuasive.

Defendant asserts the appellate court's holding is contrary to the policy behind section 4—406 because sight review of checks does not necessarily detect forgeries. Defendant also contends that the Code does not require banks to know the genuineness of a customer's signature on a check. Moreover, defendant points out banks have no statutory duty to perform any specific review procedure, including sight review.

First, I am not requiring a bank to guaranty the signatures on all of the checks it sight reviews. In other words, if a bank institutes sight review, it is not automatically liable for any forgeries it may fail to detect. The Code only requires banks to exercise *ordinary* care; that is, to exercise the degree of care which would "reasonably relate to the detection of unauthorized signatures." *Medford*, 66 Or. App. at 593, 76 P.2d at 332.

Second, the Code only allows banks to pay checks with authorized (nonforged) signatures (Ill. Rev. Stat. 1983, ch. 26, pars. 3—404, 1—201(43)) and checks which are "properly payable" (Ill. Rev. Stat. 1983, ch. 26, par. 4—401(1)). Moreover, defendant required plaintiff to sign and have on file signature cards. Consequently, while the Code does not expressly require banks to sight review checks, banks are required to know their customers' signatures. (See *W.P. Harlin Construction Co. v. Continental Bank & Trust Co.* (1970), 23 Utah 2d 422, 427, 464 P.2d 585, 588; *Maddox v. First Westroads Bank* (1977), 199 Neb. 81, 87, 256 N.W.2d 647, 652 (the court affirmed entry of summary judgment for plaintiffs, holding the bank liable for savings account withdrawal slips containing forged signatures based on the same rules applicable to banks with respect to forged checks).) How banks choose to fulfill their duty is up to them as long as

they exercise ordinary care. As I have indicated, defendant did not exercise such care.

In summary, it is of little consequence that four other banks in the area use the same procedures as defendant. We should not permit an industry to establish a standard which relieves it of its duty of care to a large segment of its customers. Defendant has no procedure to review the signatures on checks drawn for less than $1,000, even though it has a duty to plaintiff. Where a duty is owed and none is given, the only reasonable conclusion is the one reached by the circuit and appellate courts.

JUSTICE CLARK joins in this dissent.